UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-CV-14460-CANNON/MCCABE

ROBIN PAGE, FABRICIO VASQUEZ, and
WESTON LANDIS,

      Plaintiffs,

v.

DEPUTY SHERIFF STEVEN O'LEARY,
in his individual capacity, and
SHERIFF WILLIAM D. SNYDER, in his
official capacity,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE comes before the Court on a Motion for Summary Judgment ("Motion") (DE 67) filed by Sheriff William D. Snyder in his official capacity ("Defendant"), which was referred to the undersigned by United States District Judge Aileen M. Cannon (DE 88). For the reasons set forth below, the undersigned **RECOMMENDS** that the Motion be **GRANTED** in part and **DENIED** in part.

## I.    OVERVIEW

This is a case about a former deputy sheriff of the Martin County Sheriff's Office, Steven O'Leary ("Deputy"), who made a series of false arrests with fabricated evidence during his probationary term of employment in 2018 and 2019. Deputy is currently serving a seventeen-year prison sentence as a result of his misconduct. Among other victims, Deputy falsely arrested and fabricated evidence against the three Plaintiffs in this case. As a result, Plaintiffs brought claims

against Deputy and Defendant pursuant to 42 U.S.C. § 1983 for violation of their civil rights. Deputy has defaulted, so this Motion pertains solely to Defendant.

The operative complaint alleges three "*Monell*" claims against Defendant (Counts III, VII, and XI), so-named for *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court case that articulated the standard for holding municipal entities liable under 42 U.S.C. § 1983 (DE 10). The operative complaint also alleges three state-law claims against Defendant (Counts IV, VIII, and XII), for false arrest and imprisonment, seeking to hold Defendant vicariously liable for Deputy's misconduct under a respondeat superior theory (DE 10).

On June 22, 2022, Defendant filed this Motion, seeking summary judgment on two grounds: (1) Plaintiffs' section 1983 claims fail because Plaintiffs cannot meet the standard set forth in *Monell*; and (2) Plaintiffs' state-law claims fail under sovereign immunity because Deputy committed his offenses "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights" within the meaning of section 768.28(9)(a), Florida Statutes.

## II.   SUMMARY JUDGMENT STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that "there is an absence of evidence to support the non-moving party's case." *Id.* at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ... the court may ... grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (cleaned up).

In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court also must resolve ambiguities and draw justifiable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Ultimately, "the trial court may … deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Id.*

## III.   UNDISPUTED FACTS

The record evidence shows the following undisputed facts.

### A.   Events Prior to Plaintiffs' Arrests

Defendant hired Deputy on February 1, 2018, on a probationary period of employment (DE 69 ¶ 9). During Deputy's tenure, he met all requirements to serve as a law enforcement officer in

Florida, including training related to making lawful arrests, searches, and seizures (DE 69 ¶ 52). Defendant initially assigned Deputy to a training unit for new recruits, then to the Uniform Road Patrol Division, where he worked the midnight shift (DE 69 ¶ 10-13).

During his period or employment, Deputy developed a reputation for making a high number of narcotics arrests (DE 71-4 at 37-38, 41-42; DE 72-4 at 19-20). Although the record is not clear as to timing, at some point Deputy's supervisors even had discussions whether his numbers were "too good to be true" (DE 71-4 at 42).

From May 3, 2022, to September 22, 2018, Deputy made a series of arrests, during which he tampered with evidence, made false official statements, and committed other official misconduct (DE 10-2 at 23-32). On numerous occasions, Deputy also seized purported narcotics evidence that later tested negative for controlled substances or positive for a controlled substance other than the one he claimed to have seized (DE 10-2 at 25-26, 30, 32). Further details of these arrests will be described below in section IV.C.1, titled "Notice."

   B.    **Plaintiffs' Arrests**

On September 23, 2018, Deputy made a road-side traffic stop of Plaintiff Landis for having non-working tag lights and obstructing the roadway by traveling too slowly (DE 69 ¶ 15). Deputy ordered Landis out of the vehicle and requested a K-9 unit (DE 69 ¶¶ 16-17). Deputy claimed the K-9 alerted to the presence of narcotics, so he searched the vehicle and claimed to discover a substance that field tested positive for fentanyl (DE 69 ¶¶ 17-19). Deputy then arrested Landis for possession of a controlled substance and possession of drug paraphernalia (DE 69 ¶ 20).

The State Attorney later charged Landis with several offenses stemming from this arrest (DE 69 ¶ 37; DE 68-3 at 1). Ultimately, laboratory analysis showed the substance that Deputy claimed to recover from Landis's vehicle contained no controlled substances (DE 69 ¶ 38).

On October 14, 2018, Deputy made a road-side traffic stop of Plaintiffs Page and Vasquez, who were traveling together in Page's vehicle (DE 69 ¶¶ 22-23). Deputy claimed the vehicle attempted to run a stop sign (DE 69 ¶ 24). Deputy ordered Page and Vasquez out of the vehicle and requested a K-9 unit (DE 69 ¶ 25). Deputy claimed the K-9 alerted to the presence of narcotics, so he searched the vehicle and claimed to discover substances that field tested positive for crack cocaine and methamphetamine (DE 69 ¶¶ 25-28). Deputy then arrested Page and Vasquez for possession of controlled substances (DE 69 ¶¶ 29-30).

The State Attorney later charged Page and Vasquez with several offenses stemming from this arrest (DE 68-3 at 2-3). Ultimately, laboratory analysis showed the substances that Deputy claimed to recover from the vehicle contained no controlled substances (DE 69 ¶ 39).

### C.     Events After Plaintiffs' Arrests

Following Plaintiffs' arrests, Deputy continued to make high numbers of narcotics arrests, during which he tampered with evidence, made false official statements, and committed other official misconduct (DE 10-2 at 34-35, 38-58). Deputy also continued to seize purported narcotics evidence that later tested negative for controlled substances or positive for a controlled substance other than the one he claimed to have seized (DE 10-2 at 35, 39, 41-44, 46, 48, 50-51, 53, 55).

On or about January 11, 2019, an Assistant State Attorney ("ASA") contacted Defendant to advise that laboratory testing in three unrelated cases had shown samples seized as controlled substances, in fact, contained no controlled substances at all (DE 69 ¶ 32; DE 72-4 at 12). Defendant's records showed that, in all three cases, Deputy had made the arrests, field tested the evidence, and submitted it to the evidence unit (DE 69 ¶ 33; DE 72-4 at 14).

On the same day as the ASA's phone call, one of Deputy's supervisors went immediately to the evidence unit to review evidence seized by Deputy (DE 72-4 at 15). The supervisor

immediately knew that "something was wrong with the evidence" (DE 72-4 at 15).  On January 11, 2019 – still the same day as the ASA's phone call – Defendant placed Deputy on administrative leave and commenced a criminal investigation (DE 69 ¶ 35).  Defendant thereafter rescinded Deputy's probationary period of employment, effectively terminating him (DE 69 ¶ 36).  On January 15, 2019, the State also dropped all pending criminal charges against the three Plaintiffs in this case (DE 69 ¶ 37).

Thereafter, on August 9, 2019, the State charged Deputy by way of a fifty-count criminal information, *State v. Steven O'Leary*, Case No. 2019CF000872 (DE 69 ¶ 46).  The information included eighteen counts of official misconduct, nine counts of false official statement, eight counts of tampering with evidence, thirteen counts of false imprisonment, one count of second-degree petit theft, and one count of battery (DE 69 ¶ 46; DE 10-2).  The information included crimes committed against Plaintiffs Landis, Page and Vasquez, represented as counts 3, 5, 6, 28, 29, 36, 38, and 39 (DE 69 ¶ 47).

On December 2, 2021, Deputy pled nolo contendere to all counts of the information (DE 69 ¶ 48).  The state court adjudicated him guilty and sentenced him to seventeen years' imprisonment (DE 69 ¶¶ 48-49; DE 68-4).  As of the date of this Report and Recommendation, Deputy remains in prison (DE 69 ¶ 50).

## IV.   *MONELL* CLAIMS

Counts III, VII, and XI allege claims under 42 U.S.C. § 1983, which provides a remedy against "every person," who under color of state law, deprives another of rights secured by the Constitution and laws of the United States.  In *Monell,* 436 U.S. at 658, the Supreme Court recognized that a municipality qualifies as a "person" subject to suit under section 1983.  To demonstrate liability against a municipality, however, a plaintiff must do more than merely show

that the municipality employed a tortfeasor, as the doctrine of respondeat superior does not apply to section 1983 actions.  *Id.* at 691.  "[A] city is not vicariously liable under § 1983 for the constitutional torts of its agents:  It is only liable when it can be fairly said that the city itself is the wrongdoer."  *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992).

As such, the Supreme Court has defined very narrow circumstances under which a municipality can be held liable for a constitutional injury.  In this case, Plaintiffs have identified three recognized theories of section 1983 *Monell* liability:

- where the municipality adopts an "official policy" that causes constitutional injury;

- where the municipality follows a "custom or practice" that causes a constitutional injury; and

- where the municipality's "failure to train or supervise" causes a constitutional injury.

The Court will address each theory in turn.

### A.   Official Policy

First, *Monell* recognizes that section 1983 liability attaches when the municipality itself adopts a formal policy, rule, or regulation that causes constitutional violations.  436 U.S. at 658. In *Monell*, for example, the municipality adopted a formal policy that required pregnant employees to take unpaid maternity leave before such leave was medically necessary.  *Id.* at 660-61.  As such, the municipality adopted a formal policy that served as the "moving force" for a constitutional violation inflicted on female employees.  *Id.* at 694-95.

The undisputed facts here show Plaintiffs have no viable claim under this theory. Defendant never adopted any formal policies that directed employees such as Deputy to make arrests without probable cause, to fabricate false evidence, or to make false statements in police records.  To the contrary, Defendant's formal policies forbade such conduct (DE 68-6 ¶¶ 5-6).  To

the extent Plaintiffs pursue a *Monell* claim under the "official policy" theory, summary judgment should be entered in Defendant's favor.

### B. Custom or Practice

Next, *Monell* recognizes that municipalities may follow informal customs or practices that cause constitutional violations even though such customs or practices have "not received formal approval through the body's official decisionmaking channels." *Id.* at 690-91 (citations omitted). To prove a custom or practice, a plaintiff must establish a widespread pattern of conduct "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). As the custom must be widespread and repeated, "random acts or isolated incidents are insufficient to establish a custom[.]" *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986); *see also Casado v. Miami-Dade Cnty.*, 340 F. Supp. 3d 1320, 1328 (S.D. Fla. 2018) ("[T]he plaintiff must allege a 'pattern' of excessive force including specific facts of numerous incidents[.]").

The undisputed facts here show Plaintiffs have no viable claim under this theory. Defendant's employees did not engage in a widespread pattern of making arrests without probable cause, fabricating evidence, or making make false statements in police records. To the extent Plaintiffs pursue a *Monell* claim under the "custom or practice" theory, summary judgment should be entered in Defendant's favor.

Plaintiffs make two arguments to overcome this hurdle. First, they point to record evidence showing the pattern of false arrests and other misconduct by Deputy. The Court finds the actions of a single rogue deputy do not establish a "custom or practice" on the part of the entire municipal entity. "[A] single, isolated unconstitutional action by 'rogue' employees of the municipality will

almost never trigger municipal liability under § 1983." *Victoria W. v. Larpenter*, 205 F. Supp. 2d 580, 589 (E.D. La. 2002). Rather, section 1983 liability for the acts of a single rogue employee must be analyzed under the "supervision and training" theory discussed below.

Next, Plaintiffs point to a June 14, 2018, incident in which Sheriff Snyder himself personally conducted a roadside traffic stop of Plaintiff Landis (DE 72-2 at 59). The record remains unclear why Sheriff Snyder initiated the traffic stop. After stopping the vehicle, however, Sheriff Snyder requested a K-9 unit to respond, and the K-9 alerted to the front passenger side of the vehicle (DE 72-2 at 60). Sheriff Snyder then searched the vehicle, found no controlled substances, and took no further action (DE 72-2 at 61). The record reflects that Deputy responded to the scene of this traffic stop, along with numerous other police officers (DE 72-2 at 60).

Plaintiffs argue this incident, when combined with Deputy's other misconduct, shows a widespread pattern, on behalf of the municipal entity, of making improper traffic stops. The Court does not agree. Although the record is silent as to why Sheriff Snyder stopped the vehicle, the record shows he found no narcotics and did not place Landis under arrest. The Court therefore finds this evidence dissimilar and insufficient to create a jury issue on a *Monell* "custom and practice" theory. *See Guzman v. City of Hialeah*, No. 15-cv-23985, 2017 WL 4324632, *1 (S.D. Fla. Sept. 29, 2017) ("The incidents cited by Plaintiff are too remote and dissimilar to plausibly establish that the City maintained a wide-spread practice or custom of allowing its police officers to engage in excessive force."); *Lawrence v. Metro Dade Cnty.*, 872 F. Supp. 957, 963 (S.D. Fla. 1994) ("Random acts or isolated incidents are usually insufficient to establish a custom or policy.") (citing *Depew*, 787 F.2d at 1499).

C.      **Failure to Train or Supervise**

Next, the Supreme Court recognizes "limited circumstances" under which "failure to train" can give rise to section 1983 liability.  *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989). Specifically, inadequate training "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.* at 388.  To show "'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and that the municipality made a deliberate choice not to take any action."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).  The Eleventh Circuit has repeatedly held that, without notice of a need to train or supervise in a particular area, a municipality cannot be liable as a matter of law under a *Monell* failure to train/supervise theory.  *Id.*; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 407-08 (1997) ("In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury.").

The Supreme Court has cautioned that rigorous standards of fault and causation must be employed so that failure-to-train/supervise claims do not collapse into respondeat superior.  *See Canton,* 489 U.S. at 379 ("To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983.").  "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."  *Id.* at 392; *see also Bd. of Cnty. Comm'rs*, 520 U.S. at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so,

rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.").

Defendant argues summary judgment should be granted here because Plaintiffs cannot show two of the essential elements necessary for a failure-to-train/supervise claim, namely, (1) proof that Defendant had notice of materially similar allegations of past constitutional violations, and (2) proof that the alleged failure to train/supervise caused Plaintiffs' injuries.

The Court will address argument each in turn.

### 1.    Notice

To satisfy the notice requirement, Plaintiffs must prove that Defendant "knew based on at least one earlier instance of unconstitutional conduct materially similar to [Deputy's] violation of [Plaintiffs'] constitutional rights that [additional] [training/supervision] was needed to avoid [similar constitutional violations] likely recurring in the future." *See* Eleventh Circuit Pattern Jury Instruction (Civil) No. 5.11, Government Entity Liability for Failure to Train or Supervise. The Eleventh Circuit has emphasized that "[e]stablishing notice of a need to train or supervise is difficult." *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1189 (11th Cir. 2011).

At the outset, Plaintiffs cannot rely upon evidence that post-dates their arrests to show notice. *See Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990) (affirming judgment where "court found no evidence of a history of widespread *prior* abuse by Department personnel that would have put the sheriff on notice of the need for improved training or supervision") (emphasis added). Here, most of Deputy's wrongdoing took place after Plaintiffs' arrests. Defendant cannot be charged with knowledge of these events for purposes of a failure-to-train/supervise claim. Likewise, Defendant cannot be charged with knowledge of test results from the Indian River Crime

laboratory, which showed Deputy had seized non-narcotics evidence, where those test results came back *after* Plaintiffs' arrests.

The Court nevertheless finds that Plaintiffs have proffered sufficient evidence to create a genuine issue of fact as to notice. In particular, Defendants have proffered two categories of evidence that, in combination, give rise to a jury issue: (1) supervisory knowledge of the unusually high number of narcotics arrests made by Deputy, and (2) abnormalities with evidence seized by Deputy prior to Plaintiffs' arrests. In the Court's view, neither category of evidence would be sufficient to create a jury issue on its own in this case, but in combination they suffice.

First, the undisputed facts show Deputy made an unusually high number of narcotics arrests, especially for someone not assigned to a narcotics unit. Deposition testimony included the following:

- Sergeant Brochu, Deputy's immediate supervisor, knew Deputy was making "more than normal" felony arrests in a month and more narcotics arrests than the average deputy (DE 71-4 at 37, 39).

- Captain Budensiek questioned Deputy, "[Y]ou're making a lot of arrests. How are you doing it?" (DE 72-4 at 20).

- Sergeant Brochu testified that three supervisors held discussions regarding Deputy's high number of narcotic arrests questioning whether they were "too good to be true" (DE 71-4 at 42).

- Lieutenant Bowdoin testified that he knew Deputy was making a lot of narcotic arrests and that he had a meeting with Deputy regarding his "high numbers" (DE 97-1 at 21, 23).

The Court notes the record remains unclear as to the timing of these suspicions by various supervisors.  To the extent such ambiguities exist in the record, the Court resolves them in favor of the non-moving party.  *See Anderson*, 477 U.S. at 255.  Accordingly, the Court interprets the record evidence to mean that Deputy had exhibited an unusually high number of narcotics arrests, and that his supervisors had become suspicious as a result, prior to Plaintiffs' arrests.

Next, Plaintiffs point to a series of abnormalities in evidence seized prior to their own arrests, including the following:

- On May 3, 2018, Deputy arrested a suspect for possession of cannabis (DE 10-2 at 23-24).  Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 72-5 at 40; DE 10-2 at 23).  The State later charged Deputy with false official statement for this incident (DE 10-2 at 8).

- On May 28, 2018, Deputy arrested a suspect for possession of cocaine (DE 10-2 at 24-25).  Deputy claimed to have photographed a black straw with cocaine residue and a small amount of "white rock like substance" (DE 10-2 at 24).  In truth, he submitted no photographs and a straw that "appear[ed] to be chewed on," which was "not consistent with the use of cocaine" (DE 10-2 at 25; DE 72-5 at 45).  The State later charged Deputy with official misconduct and tampering with evidence for this incident (DE 10-2 at 3, 9).

- On August 7, 2018, Deputy falsely arrested a suspect for possession of cannabis (DE 10-2 at 25-26).  Deputy's arrest affidavit claimed he found "marijuana rolled into a small joint inside an open beer can" (DE 10-2 at 25-26; DE 72-5 at 53).  He then submitted into evidence a beer can with some plant matter inside, but no

"rolled joint" (DE 10-2 at 26; DE 72-5 at 53).  The State later charged Deputy with official misconduct and false arrest for this incident (DE 10-2 at 4, 10).

- On August 11, 2018, Deputy arrested a suspect for possession of THC oil (DE 10-2 at 27).  Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 10-2 at 27).  The State later charged Deputy with false official statement for this incident (DE 10-2 at 8).

- On August 27, 2018, Deputy arrested a suspect for possession of THC oil, cannabis, and drug paraphernalia (DE 10-2 at 28).  Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 10-2 at 30).  The State later charged Deputy with false official statement for this incident (DE 10-2 at 8).

- On August 29, 2018, Deputy arrested a suspect for possession of methamphetamine (DE 10-2 at 29).  Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 10-2 at 30).  The State later charged Deputy with false official statement for this incident (DE 10-2 at 8; DE 72-5 at 56).

- On September 8, 2018, Deputy arrested a suspect for possession of cannabis and drug paraphernalia. (DE 10-2 at 30-31; DE 72-5 at 57).  Deputy submitted the drugs into evidence, reporting a weight of 108 grams, but laboratory testing later showed a weight of only 62.19 grams (DE 10-2 at 31; DE 72-5 at 57-58).  Deputy also claimed to have taken photographs of the evidence while on the scale but, in truth, he turned in no photographs (DE 10-2 at 31; DE 72-5 at 60-61).  The State later

charged Deputy with false official statement for this incident (DE 10-2 at 8; DE 72-5 at 59).

- On September 13, 2018, Deputy arrested a suspect for possession of cocaine (DE 10-2 at 31-32). Deputy claimed to have taken photographs and turned them into evidence but, in truth, he turned in no photographs (DE 10-2 at 32). The State later charged Deputy with false official statement for this incident (DE 10-2 at 8).

- On October 3, 2018, Deputy arrested a suspect for possession of methamphetamine (DE 10-2 at 34-35). Deputy claimed to have photographed a "white rock like substance" on a scale but, in truth, he turned in no photographs (DE 10-2 at 35). The State later charged Deputy with false official statement for this incident (DE 10-2 at 9).

Plaintiffs argue Defendant was aware, or should have been aware, of these abnormalities based on Defendant's own Standard Operating Procedure on Evidence and Property Control, which provided that narcotics evidence had to be weighed and signed off by a supervisor (DE 68-13 at 106; DE 68-9 at 107) ("In any case where narcotics … is being taken, a supervisor shall initial the receipt prior to [the narcotics] being turned into evidence."). In interpreting these procedures, one of Deputy's supervisors testified as follows:

> PLAINTIFFS' COUNSEL: And so my question is, when [a narcotic] stop … has occurred, are there any other procedures in place whereby additional supervisors kind of check on the paperwork?
>
> …
>
> CHIEF DEPUTY BUDENSIEK: [T]here's several procedures … that are part of the process. [Deputy] make an arrest. [Deputy] recover the drugs. The supervisor has to sign off on the drugs before [the drugs are] turned in to evidence. The evidence custodian pulls the drugs out, verifies that what the deputy says is in the bag is actually in the bag, as far as what they – not

> retesting it.  … But [deputy] says there's a white powdery substance that weighs 14 grams, they're verifying that, and then placing that into evidence.

(DE 72-4 at 27-28).

The Court agrees Defendant cannot claim ignorance of the above evidence-related abnormalities due to a failure to follow its own written policies.  The Court therefore finds that Defendant should be charged with the degree of knowledge it would have obtained had it followed the written policies in place.  In this regard, the Court also notes that, on the same day the ASA notified Defendant of the potential problem, Defendant commenced a criminal investigation, in part, based upon an inspection of evidence seized in Deputy's pending cases:

> PLAINTIFFS' COUNSEL:  … Did there come a point in time where it shifted from an administrative investigation to a criminal investigation?
>
> CHIEF DEPUTY BUDENSIEK:  Yes.  And that happened quickly.  After Sergeant Nelson and, at that time, Sergeant Croft, who's now captain, after they spent a short period of time in evidence going through [Deputy's] cases, they knew -- I want to say they knew on the 11th *that something was wrong with the evidence*.  Because they had found a couple of other cases where what was supposed to have been turned into evidence didn't actually – wasn't actually in evidence.

(DE 72-4 at 15) (emphasis added).  Given that a visual inspection of evidence on January 11, 2019, immediately led Deputy's supervisors to conclude that "something was wrong with the evidence," the Court finds it reasonable to conclude an earlier inspection of Deputy's evidence might have led to the same immediate conclusion.  This, in combination with the other evidence set forth above, leads the Court to conclude that a genuine issue of fact remains as to whether Defendant was on notice of at least one earlier instance of unconstitutional conduct materially similar to Deputy's violations of Plaintiffs' constitutional rights.  *See* Eleventh Circuit Pattern Jury Instruction (Civil) No. 5.11, Government Entity Liability for Failure to Train or Supervise.

2.    **Causation**

Defendant next argues the undisputed facts show Plaintiffs cannot prove causation.  To prevail on a *Monell* claim, a plaintiff must prove that the municipality's action was "the moving force behind and direct cause of the constitutional violation."  *See Bd. of Cnty. Comm'rs*, 520 U.S. at 404-15; *see also Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1165 (11th Cir. 2005) ("A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation."); *Jackson v. Sauls*, 206 F.3d 1156, 1168 n.16 (11th Cir. 2000) ("[A] plaintiff must show that except for that constitutional tort, such injuries and damages would not have occurred"; and further that such "injuries or damages was a reasonably foreseeable consequences of the tortious acts or omission[s]" at issue.).

The Court finds that a genuine issue of fact remains as to causation.  The Court has already concluded in section IV.C.1 above that a genuine issue of fact remains as to notice.  Assuming a reasonable jury determined that Defendant had notice of at least one prior, materially similar constitutional violation committed by Deputy, and that Defendant deliberately chose not to train or supervise Deputy in response, then a reasonable jury could also conclude that such failure caused the constitutional violations committed against the Plaintiffs.  *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) ("A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."); *Estate of Heenen ex rel. Heenen v. City of Madison*, 111 F. Supp. 3d 929, 961 (W.D. Wis. 2015) ("Plaintiff has also put forth sufficient evidence from which a reasonable jury could conclude that there was a 'causal link' between the City's deliberate indifference to supervision of its officers and the violation of [plaintiff's] constitutional rights.").

## V.   STATE LAW CLAIMS

Counts IV, VIII, XII allege state law claims for false arrest and imprisonment, seeking to hold Defendant vicariously liable for Deputy's conduct under a respondeat superior theory (DE 10 ¶¶ 86, 141, 180).  Defendant moves for summary judgment based on Florida's sovereign immunity statute, which provides:

> The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the government entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property. *The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.*

§ 768.28(9)(a), Fla. Stat. (emphasis added).  Given that the state court adjudicated Deputy guilty of numerous state law crimes in connection with his conduct, Defendant argues no reasonable jury could reach any conclusion except that Deputy acted in "bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property" within the meaning of the Florida statute.

The Court agrees.  "Courts construing the bad faith prong of [section 768.28(9)(a)] use the actual malice standard, which means the conduct must be committed with ill will, hatred, spite, or evil intent."  *N.R., by Ragan v. Sch. Bd. of Okaloosa Cnty.*, 418 F. Supp. 3d 957, 989 (N.D. Fla. 2019) (cleaned up).  "Malicious purpose, … mean[s] ill will, bad or evil motive, or such gross indifference to or reckless disregard of the rights of others as will amount to a willful or wanton act."  *Turner v. Phillips*, 547 F. Supp. 3d 1188, 1209 (N.D. Fla. 2021) (cleaned up).  "For conduct to be willful and wanton, it must be shown that the defendant knew, or reasonably should have

known in light of the surrounding circumstances, that his conduct would naturally or probably result in injury and, with such knowledge, disregarded the foreseeable injurious consequences." *Gregory v. Miami-Dade Cnty.*, 86 F. Supp. 3d 1340, 1343 (S.D. Fla. 2015) *aff'd* 719 Fed. App'x 859 (11th Cir. 2017).

Here, Deputy pled nolo contendere to, and the state court adjudicated him guilty of, numerous offenses arising from his interactions with Plaintiffs, including the following:

- Three counts of official misconduct, defined as "knowingly and intentionally … caus[ing] unlawful harm to another, by: (a) Falsifying, or causing another person to falsify, any official record or official document; [or] (b) Concealing, covering up, destroying, mutilating, or altering any official record or official document…." *See* § 838.022, Fla. Stat.

- Two counts of tampering with evidence, defined as "alter[ing], destroy[ing], conceal[ing], or remov[ing], any record, document, or other item with the purpose to impair its verity"… or "mak[ing], present[ing], or us[ing], any record, document, or other item, knowing it to be false."  In connection with a pending criminal trial, proceeding, or investigation by a law enforcement agency, grand jury, or legislative committee of this state is pending or is about to be instituted.  *See* § 918.13(1), Fla. Stat.

- Three counts of false imprisonment, defined as "forcibly, by threat, or secretly confining, abducting, imprisoning, or restraining another person without lawful authority and against her or his will." *See* § 787.02(1)(a), Fla. Stat.

(DE 10-2).[1]

Plaintiffs suggest that Deputy's nolo plea may have been a plea of convenience and that a jury should be allowed to determine whether his conduct, in fact, met the standard set forth in section 768.28(9)(a), Florida Statutes.  The Court disagrees.  In addition to the plea itself, the record contains ample evidence, such that no reasonable jury could reach any conclusion except that Deputy committed his offenses against Plaintiffs "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights."  As such, judgment should be entered in Defendant's favor on these claims.  *See N.R., by Ragan*, 418 F. Supp. 3d at 998 ("[I]f the facts alleged can occur only from [deputy's] bad faith or malicious or wanton and willful conduct, then the claim against the government entity fails on sovereign immunity grounds [under Florida law.]"); *Gregory*, 86 F. Supp. 3d at 1343 (dismissing complaint against Miami-Dade County, on sovereign immunity grounds, where "officer['s] actions were done, at the very least, in a manner exhibiting wanton and willful disregard of [defendant's] rights and safety").

## VI.   PUNITIVE DAMAGES

Finally, the WHEREFORE clauses of all six counts leveled against Defendant seek punitive damages (DE 10 at 14, 23, 31).  Defendant seeks summary judgment, arguing punitive damages cannot be recovered in section 1983 action against a municipal entity (DE 67 at 13).  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983."); *Colvin v. McDougall*, 62 F. 3d 1316, 1319 (11th Cir. 1995) ("[B]arring a punitive damage award [under § 1983] against Sheriff … in his official capacity" and the Sheriff's Office), for support.  During oral argument, the Plaintiffs

---

[1] The State charged Deputy by way of a fifty-count information.  Counts 3, 10, 11, 28, 29, 36, 40, and 41 covered Deputy's crimes against the Plaintiffs in this case (DE 10-2 at 4, 6-7, 9-11).  The state court adjudicated Deputy guilty on all these offenses (DE 68-4).

conceded.  The Court agrees.  To the extent Plaintiffs seek punitive damages in this case, summary judgment should be entered in Defendant's favor.

## VII.    CONCLUSION & NOTICE OF RIGHT TO OBJECT

Based on the foregoing, the undersigned **RECOMMENDS** that Defendant's Motion (DE 67) be **GRANTED** in part and **DENIED** in part as follows:

(1)    The Motion should be **GRANTED** as to Counts III, VII, and XI to the extent Plaintiffs pursue claims under the "official policy" or "custom or practice" theories and **DENIED** to the extent Plaintiffs pursue claims under the "failure to train/supervise" theory.

(2)    The Motion should be **GRANTED** as to Counts IV, VIII, and XII.

(3)    The Motion should be **GRANTED** as to any request for punitive damages.

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with United States District Judge Aileen M. Cannon.   Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation.   *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach in the Southern District of Florida, this 2nd day of November 2022.

RYON M. MCCABE
U.S. MAGISTRATE JUDGE